**Rosa Herlinda CASTRO BOBADILLA, Petitioner,**

v.

**Janet RENO, Attorney General of the United States, Respondent.**

No. 93–0927–CIV.

United States District Court, S.D. Florida.

July 9, 1993.

Samuel Smargon, Brenda G. Bryn, Asst. Federal Public Defenders, Miami, FL, for petitioner.

Luis Perez, Asst. U.S. Atty., Miami, FL, for respondent.

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

GRAHAM, District Judge.

THIS CAUSE came before the Court upon the Petitioner, Rosa Herlinda Castro Boba-

dilla's ("Rosa Castro"), Petition for Writ of Habeas Corpus filed May 14, 1993.

### I. Procedural Background

On November 30, 1992, a complaint and warrant for the arrest of Rosa Castro were filed pursuant to 18 U.S.C. § 3184 and the Extradition Treaty between the United States and the Republic of Honduras. On March 11 and 12, 1993, United States Magistrate Linnea R. Johnson conducted an extradition hearing. Magistrate Judge Johnson issued an Order of Extradition on March 16, 1993, ordering that Rosa Castro be committed to the custody of the United States Marshal until she is surrendered to the Government of Honduras and that the Court's findings, together with a copy of all the evidence received be certified to the Secretary of State. On June 9, 1993, Judge Johnson issued an Amended Order of Extradition delineating her factual findings.

Rosa Castro seeks a Writ of Habeas Corpus on the grounds that Judge Johnson's legal interpretation of Article XII of the treaty between the United States and Honduras is incorrect and that the evidence presented was insufficient to support a finding of probable cause.

### II. Factual Background

Rosa Castro is charged with murder, in violation of Article 117, Title 1, Book II, Special Section, Chapter on Crimes Against the Life and Physical Integrity, of the Honduran Penal Code. Rosa Castro is a forty-two year old Honduran citizen who was married to Jose Antonio Debbe Ramos, the then personnel director of the Direccion Nacional de Investigacion (DNI), the Honduran secret police.[1] Rosa Castro has three children, one of which is fathered by Antonio Debbe Ramos.

In February 1992, Rosa Castro and Fernando Marichal Callejas ("Callejas")[2] were lovers[3]. On February 14, 1992 at approxi-

---

1. Rosa Castro testified that "supposedly" she is already divorced from her husband. (Transcript of extradition hearing before Magistrate Judge Johnson March 11, 1993 at 147.)

2. Callejas was the first cousin of the President of Honduras, Raphael Callejas, and the manager of the Procesora Metropolitana de Carnes (PROMDECA), the Metropolitan Meat Processor.

3. Transcript of extradition hearing before Magis-

mately 5:00 a.m. Callejas was reported missing by his wife. Callejas' vehicle, a Nissan Pathfinder, was last seen on February 13, 1992 between 4:00 p.m. and 5:45 p.m. in front of the home of Rosa Castro. On Saturday, February 17, 1992 Callejas was found dead in the luggage compartment of his Nissan Pathfinder. Callejas had been strangled and hog-tied. There was a boot print on Callejas back which was later determined to be from the type of boots commonly worn by the military.

Rosa Castro was arrested in Honduras in connection with the murder of Callejas. While in custody in Honduras, Rosa Castro exhibited transvaginal bleeding and was transferred to a hospital for medical attention.[4] Rosa Castro left the hospital and eventually made her way to the United States.[5]

In support of its extradition request, the United States, acting on behalf of the government of Honduras, submitted the declaration of Keith Loken of the United States Department of State that the Treaty between the United States and Honduras is in full force and effect. Attached to said declaration are the diplomatic note formally requesting the extradition of Rosa Castro and a copy of the Treaty between the United States and Honduras. The government also submitted a compilation of Honduran documents with translations which includes: (1) a sworn statement by Judge Jesus Manuel Martinez Suazo, Judge of the First Criminal Court of Letters, describing the investigation and his findings in connection with the role of Rosa Castro in the murder of Callejas; (2) two autopsy reports regarding the death of Callejas; (3) the transcripts of the statements of Rosa Castro given on February 21, 1992 and March 11, 1992; (4) the transcripts of the statements of Bessy Luz Amador Martinez,

Leonila Mejia, Gustavo Andres Dominguez Hernandez and Jimmy Lordwind Lozano Mejia; (5) Arrest Orders issued against Rosa Castro; (6) copies of checks written by Callejas to bearer which Rosa Castro cashed; and (7) photographs of the body of Callejas, the Pathfinder, fibers found in the rope used to tie Callejas and objects found in the house of Rosa Castro's neighbor, Leonila Mejia.

At the extradition hearing, Rosa Castro presented the testimony of the following persons: (1) Ana Carazo–Johanning on the admissibility of testimony and evidence under Honduran law; (2) Edward Whittaker concerning the reliability of the fiber and serological examinations performed by the Honduran authorities; (3) Arema de Castro regarding the statement she and four other women obtained from Leonila Mejia wherein Ms. Mejia declares that her prior statements were fabrications; (4) Raul Vila concerning the findings of the Honduran pathologists; (5) Dennis Castro (the brother of Rosa Castro) regarding the violation of human rights and lack of due process in Honduras; and (6) Rosa Castro herself regarding the circumstances surrounding the murder of Callejas and her arrest and departure from Honduras. Rosa Castro also filed copies of Honduran newspaper articles concerning the murder of Callejas.

### III. Standard of Review

 As there are no appeal rights under 18 U.S.C. § 3184, a habeas corpus petition may be used to contest a Magistrate's decision on foreign extradition. *Ylipelkonen v. Stein,* 768 F.Supp. 347, 349 (S.D.Fla.1991). Habeas review is limited to inquiries as to (i) whether the Magistrate had jurisdiction over the extradition proceedings; (ii) whether the offense charged is within the treaty; and (iii) whether there was any evidence warranting

---

trate Judge Johnson March 11, 1993 at 148.

**4.** Rosa Castro alleges that she was then pregnant with Callejas' child and eventually suffered a miscarriage. (Transcript of extradition hearing before Magistrate Judge Johnson March 11, 1993 at 163–164).

**5.** The circumstances under which Rosa Castro left the hospital are in dispute. It is the government's position that she escaped after offering

10,000.00 lempiras to guards to aid and abet her departure. Rosa Castro alleges that she was kidnapped from the hospital by three armed men who came to her room and carried her to a car. The men then allegedly dropped her off at the El Salvadoran border which she crossed into El Salvador. (Transcript of extradition hearing before Magistrate Judge Johnson March 11, 1993 at 165–158).

the finding that there was reasonable ground to believe the accused guilty. *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Hill v. United States*, 737 F.2d 950, 951 n. 1 (11th Cir.1984); *Cheng Na–Yuet v. Hueston*, 734 F.Supp. 988, 990 (S.D.Fla.1990). Findings of fact are reviewed under a clearly erroneous standard. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.1986), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *Cheng Na–Yuet v. Hueston*, 734 F.Supp. at 990. Questions of law require *de novo* review. *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir.1984), *cert. denied*, 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984).

### IV. Interpretation of Article XII of The Treaty

▮ Rosa Castro challenges Judge Johnson's interpretation of the phrase "legal evidence of guilt" as used in Article XII of the Treaty.[6] Rosa Castro suggests that the Court construe this phrase as meaning either (a) a standard of proof higher than probable cause such as perhaps a standard of proof approximating proof beyond a reasonable doubt or (b) that the Court should consider only evidence which would be "legally admissible" in a trial in the requesting country. In response, the government argues that the standard of proof required is enunciated in Article I of the Treaty[7] as opposed to Article XII. There is no dispute that the standard

to which Article I refers is that of probable cause. In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning. *United States v. Alvarez–Machain*, —— U.S. ——, 112 S.Ct. 2188, 2193, 119 L.Ed.2d 441 (1992) (citing *Air France v. Saks*, 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985); *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 11, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936)). The literal interpretation of Article XII is that a fugitive may be held for up to two months during which time, the requesting government must present the magistrate or judge with sufficient evidence to support a finding of probable cause. Accordingly, the Court finds that the applicable standard to be applied in the case at bar is that of probable cause.

### V. Probable Cause

▮ The extradition hearing is not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested. *United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir.1984) (citations omitted); *see also Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir.1991) (citations omitted). When reviewing a magistrate's finding of probable cause in an extradition proceeding, the court

6. Article XII of the Treaty provides as follows:

> If when a person accused shall have been arrested in virtue of the mandate or preliminary warrant of arrest, issued by the competent authority as provided in Article XI hereof, and been brought before a judge or a magistrate to the end that the evidence of his or her guilt may be heard and examined as hereinbefore provided, it shall appear that the mandate or preliminary warrant of arrest has been issued in pursuance of a request or declaration received by telegraph from the Government asking for the extradition, it shall be competent for the judge or magistrate at his discretion to hold the accused for a period not exceeding two months, so that the demanding Government may have opportunity to lay before such judge or magistrate legal evidence of the guilt of the accused, and if at the expiration of said period of two months such legal evidence shall not have been produced before such judge or magistrate, the person arrested shall be released, provided that the examination of the

charges preferred against such accused person shall not be actually going on.

7. Article I provides that:

> It is agreed that the Government of the United States and the Government of Honduras shall, upon mutual requisition duly made as herein provided, deliver up to justice any person who may be charged with or may have been convicted of any of the crimes specified in Article II of this Convention committed within the jurisdiction of one of the Contracting Parties while said person was actually within such jurisdiction when the crime was committed, and who shall seek an asylum or shall be found within the territories of the other, provided that such surrender shall take place only upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been there committed.

examines the record to see whether there was competent evidence to support the conclusion that there was probable cause to believe the petitioner guilty. *Zanazanian v. United States,* 729 F.2d 624, 625 (9th Cir. 1984); *Merino v. United States Marshal,* 326 F.2d 5, 11 (9th Cir.1963) (citing *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)). The scope of the district court's review of the magistrate's determination of probable cause is limited to "whether there was *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty." *Quinn v. Robinson,* 783 F.2d 776, 790 (citing *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)).

■■■■ In extradition proceedings, probable cause is measured by the federal standard used in preliminary proceedings. *Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir. 1980): *United States v. Barr,* 619 F.Supp. 1068, 1071 (E.D.Pa.1985). The federal probable cause standard requires "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Republic of France v. Moghadam,* 617 F.Supp. 777, 782 (D.C.Cal.1985). An extradition hearing is not conducted under the Federal Rules of Criminal Procedure, Fed.R.Crim.P. 54(b)(5), and generally is not considered a criminal proceeding. *Sabatier v. Dabrowski,* 586 F.2d 866, 869 (1st Cir.1978). Hearsay and other excludable evidence may be admissible at an extradition hearing. *Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981) (citation omitted); *Simmons v. Braun,* 627 F.2d 635, 636 (2d Cir.1980). Petitioner's right to introduce evidence is limited to testimony which explains rather than contradicts the demanding country's evidence. *Gill v. Imundi,* 747 F.Supp. 1028, 1040 (S.D.N.Y. 1990); *Cheng Na–Yuet v. Hueston,* 734 F.Supp. 988, 995 (S.D.Fla.1990); *Eain v. Wilkes,* 641 F.2d 504, 511 (7th Cir.1981) (citing *Shapiro v. Ferrandina,* 478 F.2d 894, 905

(2d Cir.1973)). Competent legal evidence is that which is properly admissible at the extradition hearing.

■■■■ Rosa Castro and five others testified on her behalf at the extradition hearing. The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate. *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir.1986); *United States v. Wiebe,* 733 F.2d at 553 (ordinarily, questions regarding the weight and sufficiency of the evidence presented at an extradition hearing simply are not reviewable in habeas corpus proceedings).

Rosa Castro's testimony merely gave the opposite version of the facts as presented by the government. This is not enough to destroy the probability of guilt. Raul Vila, a Deputy Chief Medical Examiner in Broward County and friend of Rosa Castro's brother [8], testified as to the incompetent and sloppy manner in which dead bodies are investigated in Honduras. Dr. Vila further testified as to inconsistencies in the autopsy reports and the physical strength required to commit the subject murder. Dr. Vila's testimony included the following: (i) Callejas had been dead close to or less than twenty-four hours when his body was found [9]; (ii) the knots in the ropes found on Callejas' body were professional [10]; (iii) there was cow manure on Callejas' shoe indicating he was in a field at the time he expired [11]; and (iv) in his opinion, a female could not have murdered Callejas alone.[12] Although Dr. Vila's testimony cast considerable doubt on the government's evidence, it was not enough to negate it.

Edward Whittaker, a forensic scientist, testified as to the unreliability of the Honduran reports on the blood and fibers taken from Rosa Castro's home and those found with Callejas' body. The Court is persuaded by Petitioner's argument that the government's evidence concerning the blood and fibers is incompetent due to lack of generally accepted scientific procedures.

---

**8.** Transcript of extradition hearing before Magistrate Linnea R. Johnson March 11, 1993 at 85.

**9.** *Id.* at 79.

**10.** *Id.* at 80.

**11.** *Id.* at 83.

**12.** *Id.* at 84.

Arema de Castro, Rosa Castro's sister-in-law, testified as to the circumstances under which she obtained a statement from Leonila Mejia which contradicts the previous statements made by Ms. Mejia to the Honduran Court.[13] In the first statement which Ms. Mejia gave to Honduran authorities on February 27, 1992 (Honduran Documents, Exhibit 6), Ms. Mejia declared that on February 13, 1992 she saw a dark vehicle of the Toyota Land Cruiser type pull up to Rosa Castro's house. The driver of said vehicle gave something to Rosa Castro who then said to Ms. Mejia, "Look, I solved my problem now" and showed her a folded paper. In her second statement on March 11, 1992 (Honduran Documents, Exhibit 9), Ms. Mejia said her previous statement was based on what Rosa Castro had told her to declare and that she made said statement because she feared repercussions to her or her children from Rosa Castro. In her third statement on March 21, 1992 (Honduran Documents, Exhibit 15), Ms. Mejia declared that she found in her house an imitation leather bag, eyeglass case, pair of glasses and a plaque with "AGAFAM" which she believed were left there by Rosa Castro and which Ms. Mejia thought belonged to Callejas because the news reports had said something about Callejas going around with a little plaque. Finally, in the fourth statement given on February 20, 1993, Ms. Mejia recants her two previous statements (attached as Exhibit B to the Petition for Writ of Habeas Corpus). In said statement of February 20, 1993, Ms. Mejia recants her prior statements which were made under oath. Therefore, since the fourth statement goes against her interest, it bears more indicia of reliability than Ms. Mejia's second and third statements. *See, Republic of France v. Moghadam,* 617 F.Supp. 777, 783 (N.D.Cal.1985).

The contradictions in the evidence may create a reasonable doubt as to Petitioner's guilt. However, it is not the Court's role to determine whether there is sufficient evidence for a conviction. *United States v. Wiebe* at 553. The resolution of conflicts in evidence must await a trial on the merits. *Freedman v. United States,* 437 F.Supp. 1252, 1267 (N.D.Ga.1977). The Court holds that the evidence submitted by the government is sufficient to support the Magistrate's finding of probable cause.

### VI. Humanitarian Considerations

■■■ Rosa Castro has raised the issue of her safety if she is returned to Honduras.[14] The degree of risk to the extraditee's life is an issue that falls exclusively into the purview of the executive branch. Accordingly, the Department of State or other executive branch officials must consider Rosa Castro's safety concerns in deciding whether she will be extradited. *See, Sindona v. Grant,* 619 F.2d 167, 174 (2nd Cir.1980); *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.1980); *United States v. Martinez,* 755 F.Supp. 1031, 1036 (N.D.Ga.1991).

### VII. Conclusion

Based on the foregoing, the Court finds that (a) Magistrate Judge Linnea R. Johnson had jurisdiction to certify the extradition warrant; (b) the crimes charged are within the extradition treaty between the United States and the Republic of Honduras; and (c) there was sufficient, albeit not overwhelming evidence to support Magistrate Judge Johnson's finding that there was reasonable ground to believe the accused guilty. Accordingly, it is hereby

**ORDERED AND ADJUDGED as follows:**

1. Petitioner's request for oral argument is DENIED.

---

**13.** The Court notes that the document which Ms. Mejia signed on this occasion was written by the attorney that accompanied Ms. de Castro and three other women to Ms. Mejia's home. (Transcript of extradition hearing before Magistrate Judge Linnea R. Johnson March 11, 1993 at 115–117.)

**14.** Rosa Castro states that "[T]his extradition case is a matter of life and death for Rosa Castro, and should not be taken lightly by the Court."

2. The Petition for Writ of Habeas Corpus is DENIED and the Petition for same is hereby DISMISSED.

3. Any pending motions are hereby DENIED as moot.

4. The extradition of Rosa Castro shall be stayed pending the filing of an Appeal within thirty days from the date of this Order.

**DONE AND ORDERED.**